IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| IN THE MATTER OF: ) | CASE NO. BK05-40061 |
| ) | |
| SANDHILLS CATTLE FEEDING, INC. and ) | |
| LARRY E. CARLSON and ) | CH. 12 |
| KAREN M. CARLSON, ) | |
| ) | Filing No. 63, 68 |
| Debtor(s). ) | |

## MEMORANDUM

Trial was held in North Platte, Nebraska, on August 2, 2006, regarding Filing No. 63, Amended Chapter 12 Plan, filed by the debtors, and Filing No. 68, Objection to Confirmation of the Plan, filed by BCD Farms, Inc. Galen Stehlik appeared for the debtors, and James Nisley and Todd Flynn appeared for BCD Farms, Inc. This memorandum contains findings of fact and conclusions of law required by Federal Rule of Bankruptcy Procedure 7052 and Federal Rule of Civil Procedure 52. This is a core proceeding as defined by 28 U.S.C. § 157(b)(2)(L).

## LAW

Section 1225(a)(3) of the Bankruptcy Code requires that a plan must have been proposed in good faith in order to be confirmed. In determining good faith, the court must examine the totality of the circumstances surrounding the plan and the bankruptcy filing. Barger v. Hayes County Non-stock Coop. (In re Barger), 233 B.R. 80, 83 (B.A.P. 8th Cir. 1999). This includes factors such as whether the debtor has accurately stated expenses and debts; whether the debtor has attempted to mislead the bankruptcy court; and whether the debtor has unfairly manipulated the Bankruptcy Code. Id. (citing Noreen v. Slattengren, 974 F.2d 75 (8th Cir. 1992) and Handeen v. LeMaire (In re LeMaire), 898 F.2d 1346 (8th Cir. 1990)). The debtor's pre-filing conduct is relevant, but not determinative of good faith. Id. (citing LeMaire, 898 F.2d at 1352). Essentially, "good faith" pertains to the debtor's fairness in dealing with creditors. Barger, 233 B.R. at 84.

## FACTS & DISCUSSION

Sandhills Cattle Feeding, Inc. ("Sandhills"), operates a cattle feed yard near Bassett, Nebraska. Larry and Karen Carlson own Sandhills, and Larry is the president and actually operated the business. The feed yard contracts with owners of calves to feed the calves for a certain length of time or until the calves reach a certain weight, at which time they can be sold with the permission of the owner. The feed yard gets paid, under a variety of arrangements, for the feed provided to the calves and reimbursed for veterinarian and other expenses directly related to the care and feeding of the calves.

In the fall of 2001, BCD Farms, Inc. ("BCD"), a Montana corporation owned by Ben and Connie Danelson, orally contracted with Larry Carlson, on behalf of Sandhills, to deliver to Sandhills 1,436 calves for feeding to a certain weight. The contract arrangements were made on behalf of BCD Farms, Inc., by Jeff Younkin, a banker who was also involved in the production of cattle in the State of Montana. He had placed cattle with Sandhills, obtaining good results, and knew others who had done the same. He contacted Larry Carlson on behalf of BCD, was assured by Mr. Carlson that the feed yard had sufficient room for the number of calves to be delivered and informed Mr. Danelson to arrange for transportation and delivery.

The calves arrived on two different days in early November 2001. They were off-loaded from the delivery vehicles and "processed" by employees of Sandhills. "Processing" apparently includes providing vaccinations, if necessary, sorting by size, applying identifying ear tags, and routing the calves to particular pens in the feed yard. It also includes preparing the paperwork for each of the animals by tag number and location.

Shortly after arrival, an unknown number of calves owned by BCD, and perhaps others, broke through a fence and escaped the feed yard. The breakout occurred at night and the calves got at least four miles from the feed yard, walking on the highway, before two different motor vehicles came upon the breakout herd, hit and killed several calves.

The local sheriff was called to both accidents and employees of Sandhills and others recruited by those employees spent several hours getting the cattle off the road and into a corral nearby. Larry Carlson and one of his employees fixed the fence and the animals were eventually trucked back to the feed yard.

According to Larry Carlson and his employees, some of the animals appeared to be stressed or sick when unloaded from the original delivery from Montana. According to Mr. Carlson, but not described on his feed invoices eventually prepared for billing BCD, at least one calf was dead on the delivery truck. As the days went by in November, more and more of the calves appeared sick, stressed and weak, and many were dying. Mr. Carlson discussed the matter with his veterinarian, Dr. Welborn, and they agreed that the animals should be medicated by Mr. Carlson, as needed. Dr. Welborn, from the description of the animals given to him by Mr. Carlson, diagnosed the illness as infectious bovine rhinotracheitis, sometimes called IBR or red-nose virus. Dr. Welborn explained that red-nose virus cannot be treated but it leads to pneumonia and pneumonia can be treated with antibiotics, which Mr. Carlson was able to administer himself.

As the month of November passed without Mr. Danelson or Mr. Younkin hearing anything from Larry Carlson about the feeding project, they attempted to reach him by phone. Eventually Mr. Younkin and Mr. Carlson connected by phone and Mr. Younkin was informed that the calves were sick and there was a high death loss. Mr. Danelson asked Mr. Younkin to go to Nebraska and look over the situation. Mr. Younkin flew to Nebraska and drove to the feed lot. When he arrived, he saw that some of the animals were sick and was informed that 172 animals had died between delivery date and the date of his visit, December 13, 2001. He then contacted Dr. Welborn. Dr. Welborn had performed necropsies on four of the dead calves and determined that his original diagnosis of red-nose virus was correct. Dr. Welborn explained to Mr. Younkin what he thought the problem was and Mr. Younkin requested Dr. Welborn to vaccinate some of the calves. Dr. Welborn did vaccinate more than 400 of the calves.

Mr. Younkin returned to Montana and explained the situation to Mr. Danelson. Mr. Younkin was not overly concerned, although he was aware that the death loss was relatively high. He was satisfied that there was sufficient feed in the bunks, that Mr. Carlson had appropriate medication and sufficient help to properly care for the animals. He therefore did not suggest to Mr. Danelson that the animals should be removed from the feed yard.

Two weeks later, on December 29, 2001, Mr. Younkin received a phone call from a Montana cattle owner whom he knew who informed him that there were problems at the Sandhills feed yard and that the calves owned by BCD should be removed as soon as possible. Mr. Younkin then flew to Nebraska and arrived on December 31, 2001. He saw numerous dead calves in the pens and

the walkways, saw other owners removing their animals and met with Mr. Carlson. He told Mr. Carlson that he wanted to remove the animals. Mr. Carlson told him that BCD owed Sandhills more than $92,000 for feed and that he wasn't going to remove any animals until the invoice was paid.

According to Mr. Younkin, he had been authorized by Mr. Danelson to get the cattle out of there under whatever conditions were required, including writing a check and stopping payment on it. Mr. Younkin wrote a check on his own account, arranged for transportation of the remaining calves to another feed yard in Atkinson, Nebraska, and supervised the removal of the calves. At that time there were 385 head fewer than had been delivered after accounting for the four calves killed during the breakout and the one that had arrived on the truck dead. As soon as the calves left the feed yard, Mr. Younkin called the bank and stopped the payment on the check.

Sandhills eventually sued Mr. Younkin on the check. A trial was held in the United States District Court for the District of Nebraska and judgment was entered against Mr. Younkin for the full amount of the check, and the judgment gave Mr. Younkin right of indemnification against BCD. That judgment was affirmed by the Eighth Circuit Court of Appeals.

Sandhills and the Carlsons were eventually sued by BCD in a Nebraska state court. The complaint in that litigation listed five causes of action, only one of which concerned a claim that Sandhills and the Carlsons converted the missing calves.

During the time the state court case was pending and as it got ready for trial, other creditors of Sandhills and the Carlsons were taking action to foreclose upon collateral, including the real estate upon which the feed yard was located.

The Carlsons and Sandhills filed Chapter 12 bankruptcy to stop the foreclosures. The bankruptcy filings also halted the state court litigation. Thereafter, the Chapter 12 cases were consolidated and the Chapter 12 plan was filed. BCD filed an objection to confirmation and a motion for relief from the automatic stay. The basis of the motion for relief from the automatic stay was that BCD should be permitted to proceed in state court with a jury trial on the claims alleged in the state court complaint. The objection to confirmation is that the debtors have converted 385 head of cattle and, therefore, the plan is filed in bad faith because it treats BCD as a general unsecured creditor.

The motion for relief was denied and BCD was given the opportunity to present any and all evidence it has concerning conversion of the calves in the context of a "good faith" issue raised in the objection to confirmation.

Trial was held on the objection to confirmation and BCD presented testimony from Mr. Danelson and others that the cattle were in good condition when loaded for the trip to Nebraska. A veterinarian testified that he had inspected the animals just prior to loading and they were not sick, were not stressed, and were in good condition for the trip. The veterinarian challenged the testimony of Dr. Welborn. As part of the argument by BCD that the court should not believe that the animals died, BCD cited a Nebraska statute requiring reporting of infectious diseases to the state authorities. Neither Mr. Carlson nor Dr. Welborn made such a report. BCD would have one infer from the lack of such a report that there actually was no infectious disease. However, Dr. Welborn testified that this particular type of disease is not the type of disease that it is necessary to report under that statutory provision. His testimony was not rebutted.

      BCD spent considerable time attempting to show that Mr. Carlson had a tendency to convert cattle owned by others and therefore he should not be believed when he claims these animals died of a disease. Each of the witnesses presented by BCD appeared credible, but their testimony was not direct evidence of conversion of the BCD calves. In contrast, the witnesses presented by the debtors, especially the employees who were responsible for care and feeding of the animals and pulling the dead ones from pens, plus the testimony of Dr. Welborn, validate the testimony of Mr. Carlson that the animals were sick from the beginning and died. There is no question that Mr. Carlson should have informed Mr. Danelson much earlier in time of the illness and the death losses. Mr. Danelson would have had a chance to attempt to save the animals by removing them from the premises or providing other types of medication and care. Nonetheless, the evidence is overwhelming, including the testimony of Mr. Younkin, who eventually became adverse to BCD as a result of the check incident but who was BCD's agent when he inspected the calves in mid-December and late December of 2001. His testimony was unequivocal that the animals were sick and that he requested the veterinarian to take further action. His testimony was also unequivocal that on both dates there were dead animals in the pens and that the head count of dead animals was significant.

## CONCLUSION

      The 385 head of cattle that BCD lost were not as a result of conversion of the animals for the benefit of the Carlsons or Sandhills, but were the result of a disease which eventually caused pneumonia and killed the animals.

      IT IS ORDERED: BCD Farms, Inc.'s objection to confirmation (Fil. #68) is overruled. The Chapter 12 plan is not filed in bad faith and it may be confirmed upon submission of a confirmation order. This memorandum is not a final order for appeal purposes. The final order shall be the confirmation order.

      DATED this 6th day of October 2006.

BY THE COURT:

/s/ Timothy J. Mahoney
Chief Judge

Notice given by the Court to:
    *Galen Stehlik
    James Nisley
    Todd Flynn
    Richard Lydick
    U.S. Trustee

Movant (*) is responsible for giving notice of this order to other parties if required by rule or statute.